We will be hearing one case this morning, which is New Concepts for Living v. National Labor Relations Board, and we will start with Mr. Baskin. Good morning. I am Maurice Baskin. I'm here on behalf of New Concepts for Living, which is a small nonprofit organization providing valuable services to the disabled community. I've reserved three minutes for rebuttal. We have a petition for review of an order of the National Labor Relations Board, which— Mr. Baskin, you really start with something of a high hurdle here, do you not, simply because of the standard of review, which is a very deferential standard of review. Am I right? Well, actually, the question that the court asked this past week and asked us to address— I was kind of leading you that way, but you were way ahead of me. Well, it was next on my list. I wanted to get to it right off the bat. Because I wanted to point out the administrative law judge made findings, heard the testimony, made credibility determinations, and that does make a difference, and Universal Camera makes that clear. You asked what the standard of review is, and according to Universal Camera, the standard requires you to determine whether the board's decision is supported by substantial evidence on the record as a whole, which is the norm. But the ALJ's findings are part of the evidence in the record, and in the court's words, the evidence may be less substantial. But that's always the case in reviewing findings made by a lower court judge or by another administrative agency. And Justice Frankfurter, in the Universal Camera opinion, made clear that they were not intending to change anything about the substantial evidence standard, right? Well, not to change—substantial evidence test applies, as always. The substantial evidence standard is not modified in any way, so it's not the standard that's modified, right? It's the interplay between what the ALJ has done and found and what the board does with what the ALJ has found. Is that correct? It's the evidence that has changed. There was this notion that the board can overturn an ALJ whenever it wants, and that's the end of it, and you just don't pay any attention to what the judge said. Universal Camera went out of its way to say it does make a difference because the judge's findings are part of the record, and this court also— Judge's findings are always part of the record. Yes, but they must— The question—what I'm trying to get at is what do you do with them? What may the board do with them? What is permissible for the board to do with them, and what do we then do with what the board has done? Right. Let me ask you a quick— Sure. So I'm not amping on my colleagues' time, but let me ask you if you would agree with this take on what I've tried to draw from both Universal Camera and looking at Allen Motor Lines. But would you agree that Universal Camera, together with this court's opinion in Allen Motor Lines, instruct this panel that if we determine that an impartial, experienced ALJ who has observed the witnesses— but also those reached by the ALJ? Yes. Thank you. To put it succinctly. And when you do that in this case, you find that the board made findings of fact that were contrary to the record and contrary to the credibility determinations of the administrative law judge, even though the board said they were accepting. But they may also be contrary, ultimately, to a determination of substantiality, may they not? The— Not simply whether they are findings by the ALJ which are supported by substantial evidence, but ultimately the question of substantiality here. Yes, I think we're saying the same thing. It's just that the findings of the judge detract if they are ignored or contradicted by the board, which they were. And we've cited numerous examples, which I can repeat a few of the salient ones. That affects how your evaluation of whether the board's ultimate decision is supported by substantial evidence or less substantial evidence. That's the term that the Supreme Court used. So where we know that there are findings by the judge on such things as—and then the board makes a statement on such things as the employee that there were no employee questions to management preceding the December 2016 memorandum, which appears to have taken on a salient position in the case. That is factually wrong. The record, and we've cited to it, page 729, shows that they did hear from employees. They heard from them after the decertification petition had to be withdrawn because of what turned out to be a false charge of an unfair labor— The board talks about context early in the opinion, the first page of the board's opinion. They actually summarize what they see to be the GC's position, the union's position, that it was the union's—that the respondent's position, new concept's position was that it was the union's inaction, not the respondent's unfair labor practices that caused employees dissatisfaction. Omitsky facts ignores important context and misapplies board precedent. That's how the board characterizes the GC's position. I would just guess that you might say that here the board did the same thing that they are contending the GC did. Oh, absolutely. I thought you were describing—I thought you were saying that was the ALJ's. So, yes, correct. The board has— That's what they say the ALJ did, but— The opposite is the case, and the record is clear. I just gave you one example, but they—when you look at the context, the board begins by ignoring the two-year failure of the union to perform any services for these employees. That's the context. The facts section is very truncated when it comes to what went on between 2014 and 2016 in the board's opinion. Would you agree? Yes. And the omission—it's not just an omission. It's a deliberate attempt to avoid the obvious consequences of that kind of failure, which the administrative lodger, who heard all the testimony and assessed credibility, found the employers' representatives to be particularly credible, and particularly the CEO. Can you tell us, what's your understanding of how we should consider the testimony of the witnesses when the ALJ found them credible and where the board has not disturbed credibility finding? Do we need to accept the testimony from those witnesses as true? Yes, in a word, because that's—what else does it mean? If the judge is finding them credible and then repeats what they said as reasons for his decision, and then the board agrees that they're credible because of their own standard that they, you know, again, would have to defy in order to undercut that, so they agree they're credible. Well, that means they're— Doesn't that mean that they are sincere in their belief as to what they're testifying to? Doesn't mean necessarily that what they're testifying to is right or wrong. It's just that they're sincere in their belief that they believe it's correct. Well, that—there are some parts where it is their belief that is the issue. Do they have a reasonable belief in a good—or a good faith doubt? The ALJ says that, for example, the CEO of New Concepts was credible and that other people were also credible. It just means that he believed that they were testifying—they were not lying while they were testifying. Yes, but he seemed to go out of his way to say he was particularly credible, and the union witnesses were generally found not to be telling the truth. Except for Donna Ingram, whom he credits. Right, right, but there was no disagreement over some of the key issues. And Donna Ingram testifies rather markedly to some of the deficiencies in union representation that existed prior to her coming on the scene, if I recall. Right, which the board doesn't talk about. And, you know, the—again, we go back to what is the context. They begin with this two-year total abdication of duty of services. The employees are worked up about it, naturally. They file a petition for decertification with no indication of any employer instigation. And then after the unfair labor practice causes that to be withdrawn, they continue to ask questions of the management. What can we do to get out of this situation? What is your argument concerning Space Needle, Mr. Baskin? It's there, but as I understand it, People's Gas and Perkins Machine are also both still there. They have not been overturned. They have not been overruled. So do you contend that Space Needle was wrongly decided? Or do you believe that Space Needle, People's Gas and Perkins Machine are irreconcilable? Or would you simply attempt to distinguish Space Needle? Our primary position, you don't need to reach the issues of whether it was correctly decided or not. It's totally distinguishable from our situation. People's Gas is directly applicable along with Perkins and Cyclops. This situation with the December 16 memo was completely lawful. They deliberately attempted to mirror People's Gas. Space Needle had issues like they required the employees to come and ask for the forms. So they had to approach management in order to get a form. Here, they sent out the forms to everyone. They had information, and this is another factual finding the board wrongly decided, the judge got it right, that we have declarations that the union confirmed that there were going to be consequences, that they do require the revocation notices to be twice a year. And at the end of December, that was going to happen. Isn't there a very good argument that Space Needle does nothing more than distinguish People's Gas? Yes, there is, and we were fit in with People's Gas. But one of the key distinguishing factors was that in Space Needle, the employer monitored responses to a memo. And so the concern here is that in the August of 2017 memo, that the responses of the employees were monitored. How do you respond to that? What's the facts, what actually happened? Yes, all that happened, there were no responses to the August memo. The union complained about the December memo. And so the company said, we'll fix it by— But what about Space Needle? I thought that's what Judge Ambrose was asking about. Wasn't there a spreadsheet kept in Space Needle? There was no spreadsheet kept here by New Concept. Correct, correct. Space Needle is a different set of facts that were—maybe they were coercive or not. We're not going to get into the question of whether Space Needle was rightly decided. It does not—application to this case is wrong. As the board has pointed out here, there was no need to get information about who was resigning, even if there was for the dues checkoff for payroll purposes. And while the payroll purposes would justify dues checkoff information getting to HR, here it also appears that the CEO was in possession of the actual—at least one actual letter, so had the identity of the employee when he's faxing that letter back over to the union. I think the answer to that is that they viewed resignation as synonymous with the dues checkoff. Why would you have to resign in order to stop paying dues? So they thought that they were synonymous. I notice my time has hit the red button. I want to reserve my rebuttal time. Well, to the extent we have continued questions— I'll be back. We'll keep going, actually. Oh, right now? Right now. You're on our time. Okay. Well, we have no one waiting behind us, so that's okay. In addition, there was a contractual basis in People's Gas for the window for the deadline for withdrawing authorization for the dues checkoff and for the collection of information by the employer as well as the union. Here, that doesn't seem to be—there was no agreement that was in place. So what significance does that have? Well, the parties viewed—I think both parties viewed the fact that the agreement had expired, that they were operating under this notion of having to maintain the status quo, and the union confirmed that they were still operating under it twice a year. And that's the past practice. There was a statement. It's not expressly in the collective bargaining agreement, but it has been the practice at the organization, and so that becomes contractual in nature or extra-contractual, which People's Gas also acknowledged can be—and I think the board concedes that that can be further ground. But the reality, however you look at it, the reality is the employer thought the union might maintain that dues checkoff window, and the union confirmed that they were right on the stand. So there's no dispute—there should be no dispute that there was this contractual past practice, extra-contractual. There was an understanding. What about the fact that the majority of the employees had three months earlier signed off on the company's checkoff card, which didn't have that provision? Well, they did it both ways. I think there were some 40 employees who signed off on the union's card. So automatically, the window is absolutely present, but it was unnecessary to spell it out on the card. It was on the form. Let me ask what that means practically. So of the approximately 90 members of the collective bargaining unit, some were subject to this or these windows, and some were not. Is that correct? I don't think the testimony is clear that any were not. The union simply put it on their form. The company created its own form to accomplish the same thing, but the reality was both parties to this agreement believed that there was at least— at the union's case, they believed there was absolutely two windows. The company—yes, there was an argument. The agreement's expired, but it looks—you know, the way the union's operating, we're concerned they're filing charges every time we do something. They believed that it was very likely that the union was going to make the same claim, and they were right. Well, the employer's card included the language of subject to the labor contract requirements. What does that mean, and where would we find in the record what significance that has? Well, I think—I don't know that there's anything in the record specifically what they thought that that particular sentence meant other than to cover themselves that they were complying. What is your argument that the new concepts form where it said subject to the labor contract requirements— I understood you to be arguing in your brief that that also could create a sort of January 1st deadline. How so, and where do we find that in the record? Because the way—for the reasons I just said, it's the same thing, same principle, that the contract— compliance with the contract. A contract, the collective bargaining agreement, includes not just its text but the practices and interpretations between the parties. And they had the view that the union could take the position that despite the expiration of the contract, that the contract did incorporate by reference the union's two window periods. So I think that's what all that—both questions really boil down to the same thing, that there was a real and legitimate— let's go back to what is the point of all this. Is this memo that they sent out justified? Is it permissible? Or is it coercive? Well, it clearly was not coercive. Nobody ever claimed to be coerced. And when they gave them the second chance, the union said, well, it was coercive. When you asked them the first time, they turned it around and said, anybody wants to go back in August, feel free. And again, no punishment. This is another finding the board made, that there was no assurance against reprisal. Both of these memos I've got right here, they both say no punishment for continuing to pay union dues, no reward for skipping the union dues. Does it matter that that doesn't address resignation, that it's limited to the dues checkoff? Well, again, I think the employer here thought resignation and dues and dues checkoff, they were all synonymous. And frankly, that's the way everybody acted to split the hair. You can't stop paying dues and not effectively have resigned from the union. Right, right, in that setting. You know, they were talking—well, there's nothing else to say. That's correct. So they thought they were synonymous. A couple of things I want to get into before you sit down, if you would. I take it everything's been on hold since around 2017 in connection with what's going on here because of all the— Yes, six years later, the employee's choice has been stifled. And how many employees are currently at the company? I do not know the answer to that, I'm sorry. One of the things I'd like to just have you address is the way we should interpret both 10E of the statute and 102-46 of the regulations. 10E talks about, you know, no objection, not urged before the board shall be considered. And 102-46 says that parties may file exceptions to rulings or cross exceptions. And it seems like there's a significant divergence in how courts narrowly or flexibly construe that. What's your understanding of—I mean, I realize there is some Third Circuit law and it goes both ways. Right. What is your understanding as to how one should interpret those particular provisions? Right. Well, the Third Circuit, as recently as the East Brunswick case, which we cited, says you look at the component of the objection, the component of the argument. Our argument—let's just take the Space Needle, people's gas issue. The company explicitly and clearly said in its letter to the board, closing its previous brief to the judge, first of all, they said the judge was right. That's it. You know, we incorporate everything the judge said. But specifically, they said—the counsel said people's gas. We complied with people's gas. That is the law. By definition, if people's gas is the law, then Space Needle is not. It makes it a component of the core argument. I thought you said earlier that Space Needle does nothing more than distinguish its facts from that of people's gas. So maybe people's gas is still the law, but Space Needle is also the law. Well, let me clarify. People's gas is the law, and the company complied with people's gas. To say that they didn't comply with some other case was not the issue. They did comply with people's gas. And so to say that we can't talk about Space Needle because we didn't mention it, we relied on people's gas. And the government, the board, is saying we should have relied on Space Needle. But that shows the core. Maybe I'm misunderstanding because my question is a little different. I'm just talking about facts found by an ALJ. What is—we'll try it a different way. What is the standard of review by the board of facts found by an ALJ? Well, where they have agreed with the credibility—the standard is actually a very differential one as to credibility. And was this ALJ pretty experienced? I haven't checked out his background, but they—I believe so, yes. And his findings were consistent with the record, whereas the board's findings were not. He observed the witnesses. He assessed their credibility. He found the employers to be credible and others not. I want to go back, though, to the East Brunswick case because—and the Tenney issue because the general counsel is really, you know, constantly harping on this, and I think totally mistakenly. The question is whether the board was put on notice by the party of the issue. Did they get the gist of it, as one of the cases says? And were the issues—the core issues presented, the core objections from which everything else is details, it's extrapolations from what are the components—that's the words that East Brunswick used in FedEx, another Third Circuit case. When you know the board got it, and believe me, they're talking all about people's gas, both the majority and the dissent, and the other issues that are raised in our brief. They were put on notice by the filing of the company. Well, that description, and our standard is articulated in New Brunswick, seems consistent with the statute that talks about no objection that has not been urged before the board shall be considered by the court. But then what are we to do with the regulation that talks about— That's the concern I have. Matters, any matter that's not included, exceptions or cross-exceptions, and seems to talk about those as every ruling, finding, conclusions, or recommendation. But we did not file exceptions or cross-exceptions. That's not applicable to the company here. The company won in front of the administrative law judge. Those are the things that the general counsel was obligated to do. According to the regulation, even in answering briefs to exceptions, a party would need to specify each of those things. But the board made no such finding as to the letter and the answering brief that was filed by the company. Did not say that it violated 102.46. It didn't violate anything. They made no adverse comment, and they considered it. But it's made jurisdictional, so we have to consider whether or not these things were properly raised. And, of course, the general counsel is urging us to conclude that it's not even sufficient that you submitted a letter with your brief to the ALJ because there wasn't a separate cross-exceptions and precise exceptions raised or precise responses raised to each of their exceptions. Right, and the only jurisdictional issue that raises is that the board didn't say that, and the general counsel has no authorization to make an argument that the board did not make. So you have no jurisdictional problem with the regulation 102.46 because the board did not rely on it. And so it's of no consequence in this situation other than your own case law says that the general counsel is not allowed to come up with reasons that the board itself did not adopt. So that's where we come out on that. You see cases throughout the country going various ways, and I'm really trying to get my arms around how to understand this regulation. It does say that you may file cross-exceptions if you are the winner before the ALJ. You filed no cross-exceptions, correct? Correct, but that's involved in the situation where you won on a lot of issues but you didn't win on some. The company won completely with the ALJ, agreed completely that this was a miscarriage to be charging them with unfair labor practices and dismissed everything. So in that situation, there's no cross-exceptions. Maybe we just continue this conversation with your opposing counsel and we'll get you back on rebuttal. Could be, except just remember the board did not rely on that, so he does not have any basis for saying so. We're asking you to consider that. We'll hear back from you on rebuttal. Thank you. Thank you. Mr. Heller. Good morning. Good to see you again. Thank you. You as well. Good morning and may it please the court. Joel Heller for the National Labor Relations Board. Is it possible to sort of segue from where we left off in trying to understand 10E and the regulation? Obviously the purpose of both is to give adequate notice to the board of issues that are before it so that nobody is hiding anything. If the board here and the ALJ did a very comprehensive opinion, the board disagreed with it, at least two members of the board disagreed with it, and the new concepts relied on the ALJ's opinion because it seemed to tee up all of the pertinent issues relating to the five areas where there's claim to be an unfair labor practice, what more do we need to do to somehow say that the board didn't have enough notice? Well, at the very least, there are issues that new concept is now raising that were not in the ALJ's decision. So even if the ALJ ruled for them on the say about the legality of the December memo, new concepts is raising arguments that the ALJ didn't make in making that finding. Specifically what? Sure. So in the December memo, the ALJ's reasoning was that based on some old case law, the employer could have stopped dues deduction because the contract had expired. And therefore, this letter about dues deduction was permissible. So that doesn't say anything about Space Needle or people's gas or any of the issues we're talking about on appeal. The ALJ ruled on a different theory. But if dues, if you ain't paying dues, you ain't belonging to the union, right? So let me correct something that was said here. So the subject of the December memo was about authorizing dues deduction. It wasn't about paying dues. Dues deduction is like a direct deposit. The employer takes the amount of dues out of the paycheck and gives it directly to the union. And so that's what the December memo was about, whether to revoke your dues deduction authorization. It wasn't to stop paying dues. So there is a difference between being a member of the union. You can be a member of the union and not authorize dues deduction. But that almost sounds benign. Do you want us to deduct dues or do you not want us to do that? That's kind of neutral, isn't it? But that's not all that was said in the December memo. If that's all that was said, maybe you would have a different case. But for all the reasons we've discussed in our brief, the facts of the December memo, the points that the board relied on. I mean the board law establishes a line between permissible ministerial aid and unlawful solicitation. Why can't that question be resolved simply by looking at the face of the December 2016 memo? What more needs to be said? What more needs to be offered by way of evidence? What more needs to be said or presented by way of argument? Right, so part of what's in the December, part of it is on the face of the December memo. The absence of assurances against reprisal, for example. The fact that it was directed, employees were instructed to return the form to the CEO of the company. So there's the monitoring aspect of it. And also looking at the cases, both People's Gas and Space Needle, they look at factors other than what's on the face of the complaint. Not the complaint, sorry. The face of the communication. For example, whether there was a deadline coming up or whether employees had asked. So this is, the fact that we're looking at these other factors is, I think everyone agrees that that is permissible. And I'd also want to correct another thing as far as monitoring. So there was a spreadsheet kept by the employer in Space Needle. There was a spreadsheet kept by New Concepts. What does monitoring mean? Or factually, what does it involve? Because what I understood the testimony here that is recited in the opinions to say is that there was presented to New Concepts a quantification. Information as to a quantification. But I don't see anything suggesting a specific name as to any of those individuals who voted for or against. So are we talking about the December memo, responses to the December memo? Well, actually, I think it could apply to several instances. That might be the August memo, right? I think both the December memo and the August memo, employees were instructed to return it to the company. And so they would know that the company knows how they respond. But there were no responses in August, right? That's correct. You're talking about a spreadsheet that came out of the December memo? For the spreadsheet, yes. That's what came out of the December memo. That's at 2614 of the appendix. It shows that they were keeping a spreadsheet of individual names who was responding. A spreadsheet or individual names? Yes. I'm blanking on that, on exactly how that quantification or characterization was reached and how it was depicted or set up. Well, because the employer is knowing how employees respond. Mechanically, how was it done? Physically, mechanically. So the employees received this. They received a template letter with the December memo that they could sign. And what did the company do with it when it was returned? So the employees returned it to the company. The company kept track of those responses. And then the company forwarded those return letters to the union. That's what happened. And the company, at least its human resources department, would have needed to have that information in terms of knowing whether or not to continue deducting dues, right? So that's the argument as to the dues. That doesn't apply to the whether employees have resigned from the union or not for the reasons I was just explaining. Those are two separate data points, whether you authorize dues deduction and whether you're a member of the union. Is the union going to allow that individual to remain a member of the union if they elect not to pay dues by having their dues deducted by their employer? Two responses. One is, yes, you can remain a member of the union and not authorize dues deduction because there are other ways you can pay dues. That was not my question. I understand that. But there is a definite advantage to the union. The union likes having a collection agent for a very good reason. Who wouldn't? It's easier. But my question was, is the union going to permit someone to remain a member of the union if they are not paying union dues, whether they're deducted or whether they're paid directly to the union? If they are not paying dues. I mean, that is that's not what the December memo was about. It wasn't about stopping paying dues. Can you be a member of the union and not pay dues? Probably not. I guess I don't know for sure what was in the bylaws of this of this local union. I would say that there was a union security clause in the contract, but the contract had expired. So that was no longer governing. The GC has made much, of course, of the December 16 memo and to some extent also the August 17 memo. The board decided, if I recall correctly, that the events preceding to the December memo, specifically the meetings that Senator Ducati had, were not being considered. They were not the subject of an unfair labor practice. The board did not deal with those as being wrong, coercive, however we want to characterize it. The board dismissed that allegation. So it really everything really begins as far as the board is concerned with the December 2016 memo in terms of the tactics being used, the allegedly coercive tactics with that memo. Am I right? Yes. Yes. So so the board has ignored that. Anything that occurred or did not occur prior to that time that has had no impact here. And in fact, has not been a reason for the December memo in the board's view, despite the fact that, as I recall the document, and I don't have it immediately here, but the the the memo begins by saying that the company has been asked by employees. Right. I don't remember it that way. Both December and August memo begin with that reference. Yes. OK. Yes, I see that. So the board didn't ignore what happened before the numerous questions is how the December we proceed. Numerous questions. You're correct. I see that about payroll deductions, though not about resignation. The hearing was was that disputed? Was that attacked in any way? Or did the document itself simply come into the record of the ALJ hearing? I don't believe that that was contested at the hearing. Again, it's talking about payroll deduction. It's talking about membership of the union. They had not doesn't say anything about receiving questions about membership. And this this solicitation covers both. But how does distinguish it from people's gas? Because the agreement there also didn't say anything about procedures for resigning. But the form that was circulated that was considered acceptable to the board had both the dues revocation and resignation. And in people's gas, the employer gave assurances against reprisal for both of those. Unlike here, it says that there won't be reprisals if you remain a member and there won't be reprisals if you continue paying dues deduction. That's not what we have here, where it does not contain those reprisals against membership. And I do want to say back to Judge Smith's question for a moment. The board didn't ignore what happened before December 2016. It acknowledged that there was some dissatisfaction with the union's performance prior to that date. My answer was that specifically it acknowledged that there was testimony to to that effect and that it was even acknowledged by the by the new. Don Ingram. Yes, she said, I have work to do. That was that was prior to December 16. But you also you have to look at what came before. But you also have to look at what came after. Because we're looking at the polling in September of 2017, the withdrawal of recognition there. The union, by that point, was actively bargaining on behalf of this unit. They were in communication with this unit. So things had changed. We were no longer at the play at the place we were in 2014 and 2015. And this court's decision in Horizon House says you look at contemporaneous evidence. What was going on closer to the point? Should we look at this from the perspective of a reasonable employee? And a reasonable employee being assured that there would be no for even for dues deduction by the terms of the memo, that there's going to be no rewards, there's going to be no punishments. Wouldn't a reasonable employee assume that that's applies to their responses generally to that memo? I mean, the I think the employer would know that there is differences between being a member of the union and being and how you pay your dues. And I understand this can look a little technical, but there's a reason why the board sets these lines that says this is what an employer has. Very little technical about coercion. Would you look at the document itself, the December 28, 2016 memo and point out to us the language, the verbiage contained therein that you believe would be coercive, pressuring, misleading point. So when it's your boss who's asking you to respond one way or the other about how you what you think about the union, there's some inherent coercion in that. And so that's why the employer has to take steps to guard against that type of coercion. That's why there are things like the assurances against reprisal or the monitoring question or the. Sorry that yes, whether there's the reason why you have to send it back a contractual, you know, as in people's gas, there was a contractual reason why it had to be returned to the employer. So there that is why the board sets out these. These factors that must be considered because of that inherent coerciveness, when it is the boss coming to employees and asking them to to to give an indication of how they feel about the exercise of their section. Your argument depend on the standard being something less than coercion. Or do you accept that the threshold is coercion? Because I understood from your brief that you were arguing that the employer has to be no more than ministerial. Great. And I can only offer passive aid. And they exceeded that here. That appears to be something different than the standard of coercion that appeared in earlier board cases. So the the language in the statute, this is a violation of Section 81, which says employee employer actions interfere with restrain or coerce. So any of those things would be a violation of Section 81. So I agree. It doesn't have to be coercion. So. All right. But so what activity here on the part of new concepts or set of Ducati or pursuant to the memo was more than simply ministerial aid. Right. And so the board has drawn this line of how you determine is this ministerial aid here? Yes. The absence of being asked of the union members and suggested in the memo that the employer would be doing is more than ministerial aid. Right. So it is the absence of the assurances against reprisal. It is the fact that there is nothing in any NLRB case law suggesting that there has to be an assurance of no reprisal. Is there? I believe I have not. I have not seen that word in any of the cases I've looked at. So in people's gas in Space Needle, the board board said that they're so in people's gas where there was no violation. One of the reasons the board found for that is because there were assurances against reprisal in Space Needle. One of the reasons the board gave for why there was an unlawful. You use the word reprisal. You don't have to use necessarily the word. Why isn't the choice of the verbiage of new concepts here in the December 2016 memo sufficient to allay any concern about reprisal? Because it doesn't go to resignation. It only goes to the revocation of the dues deduction in people's gas. You had assurances went to both of them. Here you only have to one of them. So that's a difference. Those cases are looking at assurances as one of many factors. Yes. It still appears to be a totality of the circumstances in terms of whether there's been interference, which, by the way, seems active, not limiting someone to passive communication to if even that's not an oxymoron. So in response to Judge Smith's question, is there any case that says that without assurances that it is per se coercive or per se interferes? No, I don't know of any cases that say it is a per se requirement. I'm just reading the cases, including the people's gas case that say, look out. These are the factors the board is going to consider. And in the board's decision here and the board explained why the facts of this case, all of those factors fell on the impermissible side of the line. And all of those factors distinguish this case from people's gas. If there was another case where there was, you know, if the employer was good on one of the factors, but not the other three, then the board's going to have to consider how much is enough. But it didn't have to in this case because they were all on the board determined they were all on one side of the line. And if we have a standard that's not more than ministerial or passive aid, which still sounds different than, you know, such active things as interference or coercion, then how could it ever be that an employer could provide unsolicited information to employees about their rights under section seven? So unsolicited. So I think that is an important factor, whether it was solicited or not. I think. Right. So you look at the facts of people's gas or Perkins machine. There are cases where the board has found that the employer did it right, that they gave the kind of information that was permissible. It fell on the permissible side of the line. I don't think I mean, obviously, you can correct me if I'm wrong, but I don't think their new concept is challenging the ministerial aid standard. They just think that they are correct under that analysis. And so I think. Right. You again. How I started. This is a line drawing exercise and there are cases on either side. But how can it be as a matter of as a matter of simple statutory construction, as well as common sense that you can have a statute that declares in subsection C that you can have by the employer, an expression of views without threat of appraisal or force or promise of benefit, that the expressing of views or argument or opinion or dissemination thereof, which is intended to suggest some kind of disagreement with the union, with unionization, that it's OK so long as there are no threats of appraisal or force or promise of benefit, which seems to me to be a lot more forceful, a lot more, if you want to say, even anti-union than what we have in these written memos. So there's a difference between the Tennessee protected communications, which are expressions of you. It's really speech protection. Right. It's an expression of views. But there's a difference between expression of view and taking action to to solicit an expression of you taking action. No, I don't think so. I mean, first of all, I mean, the concept is whether in written, printed, graphic or visual form. So you could they could put language like that in could have put language like that in the December 16 memo. If they if the new concept said something like, you know, we disagree with the practice of dues deduction and we we do not. What if they had said, we think that your union has done a really lousy job and we suggest you go ask Ms. Ingram what she has found that since she came on board earlier this year. Right. It's possible that that would be Tennessee protected speech. I mean, we would look at I mean, that's kind of a different analysis, whether whether employer. When an employer statement crosses the line into an 8-1 violation. But right. If that's an if it's an expression of views and it's not encouraging employees to take a certain action. Well, I guess. Right. You said go talk to your going to talk to your union rep is, I would think, different than solicitation resigning from the union. I would say exercise. Right. I'll leave it at that. That's really more than ministerial or passive aid. Sorry. That's more than ministerial. That's more than ministerial. Sorry. Or passive aid. But I think it's ministerial or passive aid towards what? I mean, it is ministerial or passive aid towards, in this case, resigning from your union is different than encourage ministerial or passive aid to go talk to your union steward or your union rep. I think those are just factually distinguished of the December 16 memo, the August 17 memo, the change in bargaining tactics or positions and the poll, which is which is the most concerning from the point of view of the NLRB. Well, the board found violations as to all of them. So all of them. Yes, they found the December and August memo were violations in direct, directly contrary to what the ALJ found. That's correct. And of course, the board can reverse an ALJ. And I guess, do you know that this ALJ, what his experience level was? I don't know. Okay. Yeah. Because one of the cases talks about when you have an experienced, in that case, the examiner, but now it means ALJ, that gets added weight. And I just trying to figure out how experienced this particular individual was. I don't know. I have no reason to think that this is this individual is not. The information is available. One of my law clerks looked at that, but I don't have it. It is at the NLRB website. There are bios of the ALJs. That's true. The big picture for all of this or the big, the overarching context is that you had a bargaining agreement that expired in 2011. It was extended to 2014 and from 2014 for a year and a half or more, nothing was done. A new, I think, union rep comes in. And by that point, employees are of this small outfit, 90 persons, is the employees are upset. And they're saying, what, you know, in effect, what are my dues going for? And some of them are taking some action on their own. It gets put on hold because the unfair labor practice complaint was filed. And in the end, it appears that most of the employees are saying we just don't want this and might have gone that way on their own. And I assume that what you're saying is that the board believes that somehow they were pushed to do so to resign because things were done that just weren't hoiled in connection with how labor negotiations should take place. I think there's actually two arguments. One is similar to what you were saying in that the unfair labor practices caused any loss of support. But the other is that it's kind of a separate but related principle that new concepts couldn't rely on evidence obtained through its unfair labor practices to take further action. So if you agree with us that the December memo was unlawful, then the response to the memo saying many employees returned the letter saying they wish to resign, you can't use that information as, for example, bargaining leverage or evidence of good faith doubt. It's the analogy, I suppose, would be to fruit of the poisonous tree in a criminal procedure case. You can't use evidence garnered from your own unfair labor practices to commit further unfair labor practices. So I think both of those are underlying the board's decision. But prior to December of 2016, there was significant discontent. That is correct. Among the employees. Right. And there was at least the beginning of an effort to decertify. That is correct. Okay. And not only was there significant discontent and probably a reason for the discontent was, as the ALJ wrote, it is undisputed that from June 2014 until at least April 2016, the union did not formally request to bargain for a successor contract. That is correct. And the terms of the expired agreement were continued on as the right. That is how labor relations work under the NRA. Yes. I mean, the board acknowledged that prior to the December 16 memo, there was some dissatisfaction with the union. But it also says you have to look at what came afterwards to evaluate new concepts, conduct in between December 2016 and when they withdrew recognition in October 2017. I think that's those. Those results, as I understood them, did not identify anybody and were in the poll was conducted in a way intended to mimic an election and with a monitor who was a former judge. An overwhelming result. An overwhelming result against the union. Isn't that consistent with the dissatisfaction reported from almost what we would consider the beginning here? That is before Ms. Ingram, even before Ms. Ingram was brought on board, but what she discovered was the case after her arrival. But I think it's my answer to Judge Ambrose's question is that it's just it's not legitimate evidence for you to be looking at because it was obtained through unfair labor practices. I understand. But if we were to consider that the December 16 memo was not in itself improper, was not an unfair labor practice, what else do you have left? Right. So if you disagree with this on the December memo, I mean, there's the other violations that were found, the bad faith bargaining. There was the August memo. The I think with sorry, specifically with the September 2017 poll, that's the board found two things. I found there was no good faith doubt, which is the prerequisite, the initial prerequisite based in part on the December memo. So so assuming if you knock out the December memo, assuming for a second that. That therefore, there was good faith doubt, but I will say there's that's not necessarily true because there were other violations, but even if you assume there was good faith doubt, there was the September poll was still unlawful because they failed to comply with the struckness safeguards. And so I think that violation still stands. And I think how was the conduct of the poll violative of struckness? Right. So it was the board didn't weigh in on the conduct of the poll because it found that the struckness factors of the again, sorry to use the word again, but the assurances against reprisal were not given. And there were other unfair labor practice. All they say is, I mean, they don't even I mean, that it's clear that these assurances weren't given all this. The argument is that we told employees that the poll would be secret, secret ballot. But that's one of that's a separate struckness factor. And so you can't say, well, we complied with this one. And therefore, that means we complied with the others. And again, and a poll is even more kind of inherently coercive when it's when it's literally your boss asking you to to vote. And so that's why the board has set up a poll is essentially disfavored. You have to overcome it with that good faith, good faith doubt and those five specific struckness safeguards. It all comes down to whether or not what we have here throughout the history and context preponderates in favor of good faith doubt or not. It does appear here. I mean, the purpose of the poll was to determine whether the union had a majority of folks who wish to form or continue with the union. And that purpose, I assume, was communicated to the employee or it was communicated to employees and assurances, not against reprisals, but it was done in secret with a judge involved, an independent person involved. That's that's arguably. What else is the employer supposed to do here? Here provided the insurance, the insurance that they would honor the results of the poll. Why? Why isn't that sufficient? Because it has to be assurances against reprisal for the results of the poll. So if the employees now I get their argument that, well, if we don't know how any given person voted, we can't reprise against that person. But there can still be a collective reprisal if employees vote to that they still want union representation. Then there can the employer could use that information to engage in reprisals against the bargaining unit as a whole. I mean, they couldn't lawfully do that, but logically they could do that. Can you point to anything in the entire record of this proceeding? That is information imparted to the employer. By any source, including Ms. Ingram. That is suggestive of the unions having. At least a majority of support, but that's not how it works. I understand you don't want it to work that way, but I'm asking about the record. How it works has to be that there is something that creates this good faith doubt, right? There has to be something that creates the doubt. There doesn't have to be evidence that shows that there is a majority. I mean, the evidence that shows there is a majority support is this is the certified bargaining representative of this unit of employees. So that's the kind of default, and it is up then to get away from that. You have to show for the poll, you have to show good faith doubt of continued support. For withdrawal of recognition, you have to show actual evidence of loss of majority support. So those are two different standards there. But the question here is against the backdrop of, and I'm sure you see lots of these cases. This is one where there's, I would imagine, a whole lot more evidence the other way in terms of employees who have taken the initiative to try to decertify themselves. And have returned these forms overwhelmingly in response to the December memo. And don't respond when given the opportunity to reenlist with the August memo. So against that backdrop, the question to you is, is there anything that does suggest that there was a majority interest in unionization? That was my question. Right. And so I acknowledge this is a tougher case than some. What is the evidence that this union has newly reengaged? Yes, there was a gap where there was no contract negotiations going on, but now there is. The union is now negotiating on behalf of this unit. There was evidence that they had reached out to members of the unit to try to reestablish a relationship. There was newsletters being given by the union to the employees telling them how the negotiations were going. So there was, I mean, look at this. There's the Penix aluminum case, a board case that this court in force that talks about was the union unable or unwilling to represent the employees. And that's where you look at when the when an employer is making an argument. Well, you know, this union is is non responsive, and therefore we can withdraw recognition unwilling or unable. I don't think we can say that local 1040 was unwilling or unable at the point at which, excuse me, the employer withdrew recognition to represent these employees. All right. Thank you. Thank you. Okay. Thank you very much. Well, thank you. Picking up on good faith doubt. It's incredible that the board would say that there wasn't good faith doubt here at numerous levels. You've got no bargaining unit members attending negotiations. You have 90 plus percent withdrawal of dues. Not one employee asking to restore the dues payments in August. You had a decertification petition signed by half the employees as the best evidence, which was unfairly blocked. You have many employees coming to management after that occurring, saying, how do we get out of this thing? If this is not good faith doubt, then the board's faith out standard is broken. And I would remind the board, the general counsel, but also the court. The job is supposed to be to protect the rights of employees, not the rights of unions. That's what the Supreme Court said in the Lechmere case. I think the board has lost its way on this. We get that. So. So enough said about good faith doubt. I did want to. I heard counsel say that the board acknowledged that numerous questions were asked. In fact, one of the specific findings with regard to the December 2016 letter by the board of J.A. 10. And that volume one appendix is that there's no evidence. The employees asked the respondent about withdrawing from the union. In fact, there was evidence. We cited it. The ALJ relied on it. That's just one of a number of instances in which the board cannot meet the substantial evidence test to return to where we began. Because they are ignoring and mischaracterizing the actual evidence of the record. Can you speak to the difference between dues deduction and authorization for dues? Dues, not paying dues at all versus dues deduction. I was looking at the people's gas opinion while you all were discussing the distinctions. And they also, they present it the same way. They equate it to, they use resign and dues authorizations. They also have less. Does a dues deduction matter in people's gas as well? Yes, yes. The language here is quite similar, almost identical to people's gas, except actually a better statement against no punishment, no retaliation, no reprisals. And so for the board to say, again, another factual error, I'll be generous and call it an error. It's right there in the memos. So as I think was described. So unless there are other questions, it's just a shame, though, that six years later these employees have not been able to exercise their freedom of choice on such an important issue. I hope people remedy that. Thank you. Thank you. We thank both counsel for an excellent briefing and argument today. It's been very helpful. We therefore also ask that a transcript be prepared and that the parties split that cost. We'll take the case under advisement.